UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPECIAL INDUSTRIES INC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:11-CV-3207 |
| | § | |
| ZAMIL GROUP HOLDING COMPANY, *et al*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

Pending before the Court are motions filed by each of the three Defendants in this case: (i) the Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) filed by Vallourec & Mannesmann Tubes SA ("V&M Tubes") (Doc. 25); (ii) the Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens filed by Zamil Group Holding Company ("Zamil") (Doc. 26); and (iii) the Motion to Dismiss for Lack of Personal Jurisdiction and Forum Non Conveniens filed by Saudi Seamless Pipes Factory Company Limited ("Saudi Pipes") (Doc. 35). Upon consideration of the parties' arguments[1] and the relevant legal authorities, and for the reasons explained below, the Court finds that the motions should be granted.

## I.    Background

This case arises from a dispute between Plaintiff Special Industries, Inc. ("Plaintiff," or "SII"), a Delaware corporation doing business in Texas, and the three Defendants, V&M Tubes,

---

[1] Because the Defendants raised new arguments in their respective replies, Plaintiff's Motion for Leave to File Sur-Replies (Doc. 64) is granted. Thus, the parties' arguments include: (i) regarding V&M Tubes' motion, SII's Response (Doc. 45), V&M Tubes' Reply (Doc. 60), and SII's Sur-Reply (Doc. 64-2); (ii) regarding Zamil's and Saudi Pipes' motions, SII's Response (Doc. 46), Zamil's Reply (Doc. 62), Saudi Pipes' Reply (Doc. 61), and SII's Sur-Reply (Doc. 64-1).

a French company; Zamil, a Saudi Arabian company; and Saudi Pipes, a Saudi company formed by Zamil in 2008. Am. Compl. ¶¶ 1-4, Doc. 21; Doc. 35 ¶ 1.

SII is a specialist in the manufacture, supply, and distribution of oil country tubular goods ("OCTG") for use in the oil and gas, refining, petrochemical, and construction industries. Doc. 21 ¶ 31. In 1993, SII recognized that an opportunity existed to develop a pipe heat-treating and threading plant in Saudi Arabia. Doc. 21 ¶ 32. In order to turn that opportunity into reality, SII prepared a feasibility study for the development of the plant, obtained a license in favor of a third party from the Saudi Ministry of Industry and Electricity, and sought a Saudi partner for the plant's construction (the "Project"). Doc. 21 ¶¶ 33-35. SII then began marketing the Project to various entities and, upon learning of Zamil's interest, sent a copy of its feasibility study to Zamil. Doc. 21 ¶ 35. The two parties entered discussions regarding Zamil's potential participation as SII's sole Saudi partner, and, in 1995, Khalid Al Zamil ("Al Zamil"), the Managing Director of Zamil, visited Texas to study the OCTG business. Doc. 21 ¶ 35, Doc. 46 at 3. During that visit, he met an SII engineer and toured two facilities similar to that proposed in the Project. Doc. 46 at 3-4. Discussions continued and eventually resulted in two letters from Zamil to SII, dated June 26, 1995, which expressed Zamil's intent to form a company (later to be known as Saudi Pipes) for the purpose of executing the Project in Saudi Arabia; appointed Charles Tarazi ("Tarazi"), SII president, as representative of the joint venture to negotiate with potential equipment suppliers and engineering companies; and stated the initial rights and obligations of each party. Doc. 21 ¶¶ 36-37. According to Zamil, however, its participation was conditioned on obtaining a loan from the Saudi Industrial Development Fund, which at first was not approved. Jardali Decl. ¶ 16, Jan. 20, 2012, Doc. 26-1. As a result, negotiations with SII ceased until 2001 or 2002, *see* Doc. 26-1 ¶¶ 16-17; Doc. 21 ¶¶ 37-39 (not identifying any

communications between 1995 and fall 2001), but SII continued to work on the Project, including the recruitment of engineers, consultants, and suppliers, Doc. 21 ¶ 44. In 2002, SII visited Zamil in Saudi Arabia in an effort to revive the Project, Doc. 26-1 ¶ 17, and communications resumed, continuing via email until 2006, when the two parties met several times in Europe for further discussions. Doc. 26-1 ¶ 17.

These meetings bore fruit in the form of a memorandum of understanding signed by both parties, dated October 17, 2006 ("First MOU") (Doc. 26-2). The First MOU states that "[t]he Parties intend to proceed with developing the Project" with the objective of "set[ting] up a Heat Treating and Threading Integrated facility in Saudi Arabia." Doc. 26-2 at 1. It then lists SII's role as "issuing the [invitation to bid] and obtaining a firm offer from the TMSI/Brandt consortium"; "negotiating license and other agreements with Hunting and API"; and "[c]oordinat[ing] with Aramco to attain approvals for Hunting and API." Doc. 26-2 at 1-2.

In May 2008, just prior to commencement of construction of the facility in July 2008, Zamil formed Saudi Pipes. Doc. 21 ¶ 47, Doc. 35 ¶ 1. On June 17, 2009, Saudi Pipes and SII also executed a memorandum of understanding ("Second MOU") (Doc. 26-3). The Second MOU, which covers the period from its signing through June 2011, lists SII's role as the "procurement of green and plain end pipe and couplings," technical support for Saudi Pipes, and recruitment of "capable personnel to run [Saudi Pipes'] sales department." Doc. 26-3 at 2-3. SII alleges that it fully performed under the First and Second MOUs, but that Zamil and Saudi Pipes have both failed to pay for that performance.

Concurrent with these events, SII was seeking a technical partner to join the Project, initiating talks with V&M Tubes in 1995 that ended in 2005 without having materialized in an agreement. Doc. 21 ¶¶ 38, 45. In 2008, at Zamil's request, SII reinitiated contact and, at SII's

expense, arranged several meetings involving the three entities in Paris, France. Doc. 21 ¶¶ 57-61. On December 7, 2010, a meeting took place between only Zamil and V&M Tubes, where V&M Tubes proposed a joint venture or total acquisition—a proposal that culminated in V&M Tubes' acquisition of Saudi Pipes in 2011 for $135 million. Doc. 21 ¶¶ 62-67. SII alleges that, in accordance with standard industry practice, it is owed a reasonable finder's fee for this transaction. Doc. 21 ¶ 68.

SII makes one final allegation related to these talks between Zamil and V&M Tubes. According to SII, "[t]hroughout the development of the Project and after the commissioning of the facility, Zamil represented . . . that SII was the exclusive sales representative/manager for the Project for the purposes of marketing, importing, and selling products in the United States, Canada, and Mexico," Doc. 21 ¶ 74, and they "worked to memorialize the exclusive representation in a written agreement" (the "Representation Agreement"), Doc. 21 ¶ 77. Relying on this oral agreement, SII invested time and money in a marketing plan and, in November 2010, arranged a "trial order" so that interested buyers could test and inspect Zamil's finished products. Doc. 21 ¶¶ 75-76. Before the agreement or trial order could come to fruition, however, V&M Tubes allegedly "instructed Zamil and/or Saudi Pipes to delay production and/or shipment of the trial order and not to execute a formal written agreement," thereby causing SII a loss of commissions on anticipated sales. Doc. 21 ¶¶ 79-80.

On August 30, 2011, SII brought this action in federal court, and, on February 29, 2012, filed its First Amended Complaint asserting the following causes of action against Zamil (and other Defendants where noted): (i) breach of contract—the First MOU; (ii) breach of contract—the Second MOU (against Zamil and Saudi Pipes); (iii) breach of contract—the Representation Agreement; (iv) breach of oral contract; (v) breach of implied contract; (vi) quantum meruit; (vii)

unjust enrichment; (viii) promissory estoppel; (ix) fraud; and (x) tortious interference with contract (against V&M Tubes only).

## II.    Legal Standard

A federal court sitting in diversity may exercise personal jurisdiction over a foreign defendant only if the forum state's long-arm statute applies and the Due Process Clause of the Fourteenth Amendment is satisfied. *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 220 (5th Cir. 2012). In Texas, the former requirement is coextensive with the latter; therefore, the question of personal jurisdiction is reduced to one of federal due process. *Id.* Due process is satisfied "if the defendant has certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alterations and internal quotation marks omitted). These minimum contacts can be either general or specific in nature. When based on substantial, continuous, and systematic contacts with the forum state, they support general jurisdiction; when based on the underlying controversy, they give rise to specific jurisdiction. *Pervasive Software*, 688 F.3d at 220, 230.

## III.    Discussion

### A.    *V&M Tubes*

SII's argument for personal jurisdiction over V&M Tubes is one of general jurisdiction. Where the nonresident defendant's contacts with the forum state are unrelated to the plaintiff's cause of action, general jurisdiction will attach as long as those contacts are substantial, continuous, and systematic. *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 217 (5th Cir. 2000). "For an individual, the paradigm forum for the exercise of general jurisdiction is the

individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear*, 131 S. Ct. at 2853-54. In other words, the contacts must be so substantial, continuous, and systematic "as to render [a foreign corporation] essentially at home in the forum State." *Id.* at 2851. The situation here, however, bears none of the traditional hallmarks required for such a finding. V&M Tubes has no office, financial accounts, employees, or agents for service of process in Texas; it does not own, rent, or lease real property in Texas; it does not sell or manufacture products in Texas; and it has never paid franchise or property taxes in Texas. Ikonomou Decl. ¶¶ 2-5, Dec. 23, 2011, Doc. 25-1. Therefore, general jurisdiction cannot exist under this traditional analysis.

Nonetheless, it is still possible to establish general jurisdiction over a parent corporation through its subsidiaries under the alter ego doctrine.[2] The alter ego doctrine "applies when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999) (internal quotation marks omitted). Application of this doctrine requires "proof of control by the parent over the internal business operations and affairs of the subsidiar[ies]" such that it "fuse[s

---

[2] SII does, in fact, argue that V&M Tubes is itself doing business in Texas, presenting two records purportedly showing direct contacts that would establish general jurisdiction even in the absence of V&M Tubes' subsidiaries: (1) bills of lading for shipments of seamless steel tubes to Houston from 2007 to 2012, Doc. 45 Ex. A at Ex. 3; and (2) a report on V&M Tubes' own website stating that a seminar in Houston was "organised by Vallourec & Mannesmann Tubes," Doc. 45 Ex. A at Ex. 9. V&M Tubes offers declaration testimony in response to both records: (1) on the bills of lading, the names, e.g., V&M Deutschland GmbH and Vallourec & Mannesmann Tuberie, and addresses, e.g., Dusseldorf, Germany and 130 Rue de Silly BP 415 in France, belong not to itself but to its subsidiaries, V&M Deutschland GmbH and V&M France, respectively; and (2) the actual entity organizing the seminar was V&M Deutschland GmbH, using the V&M Tubes trade name. Ikonomou Decl. ¶¶ 13-14, Sept. 24, 2012, Doc. 60-1 Ex. 2. While SII argues that this raises a factual dispute that must be resolved in its favor at this stage in the litigation, this is a not a precise recitation or application of the actual rule: "on a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) (quoting *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985)) (internal quotation marks omitted). Here, there is no true conflict of fact; on the contrary, Plaintiff has offered written records and from them drawn certain conclusions, but V&M Tubes has offered declaration testimony, supported by exhibits, explaining why those conclusions are wrong. Regardless, even if these arguments were resolved in SII's favor, they would still be insufficient to show the "substantial, continuous, and systematic" contacts necessary for general jurisdiction.

them] for jurisdictional purposes." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983).

Because there is no dispute that at least some subsidiaries are Texas companies and therefore subject to general jurisdiction in Texas, the only question is whether they are mere alter egos of their parent corporation. SII makes three broad arguments in favor of such a finding: (i) V&M Tubes' own declarations that it is a world-wide business with a local presence in Texas; (ii) it and its subsidiaries' websites, where there are links to each other's sites and evidence of integrated management systems; and (iii) V&M Tubes' significant contacts with its Texas subsidiaries.

The general rule is that the exercise of personal jurisdiction over a foreign corporation may not be based solely on the contacts of affiliated corporate entities, *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 346 (5th Cir. 2004) (collecting cases), and "mere unity of financial interest, ownership and control" is insufficient to justify an exception to that rule: "[t]here must be something more," *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 (5th Cir. 2001) (internal quotation marks omitted). Determining whether that "something" exists requires, at a minimum, consideration of the following factors:

> (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities.

*Freudensprung*, 379 F.3d at 346. SII makes factual allegations that are relevant to two of these factors: (i) V&M Tubes' 100% ownership of two direct subsidiaries, which in turn own 100% of five indirect subsidiaries, all having their principal place of business in Texas; and (ii) "significant overlap" between the officers and directors of V&M Tubes and its Texas

subsidiaries. Doc. 64-2 at 2. But even "100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations," as "[t]he degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship." *Alpine View*, 205 F.3d at 219 (quoting *Hargrave*, 710 F.2d at 1160) (internal quotation marks omitted).

SII's allegations are devoid of facts showing this greater than normal control. For example, despite voluminous citations to V&M Tubes' own promotional literature and online magazine, e.g., V&M Tubes' boasting of its "complete control over the entire production process" and use of words like "we" and "our" when referring to it and its subsidiaries, Doc. 45 at 4-16, these statements fail to evince anything more than a normal corporate family. V&M Tubes does not deny the existence of a "Vallourec Group" of companies, *see* Doc. 25 at 10-13, but the existence of such a group and reference to it in the first-person plural are unremarkable; more importantly, it is simply not the standard for determining whether the group should be fused for jurisdictional purposes. Regarding SII's second argument, "[a foreign company's] operation of a website containing company and product information and links to its U.S. subsidiaries also does not provide sufficient grounds for the exercise of personal jurisdiction." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 345 (5th Cir. 2002). Similarly, the references on its subsidiaries' websites to common systems, such as the "Vallourec Management System," Doc. 45 at 21, are merely examples of a standard parent-subsidiary relationship. *See Gardemal*, 186 F.3d at 594 (describing a subsidiary hotel's use of its parent's trademark, operations manuals, and reservation system as "a typical, working relationship between a parent and subsidiary," not "a blending of the two corporate identities"). Finally, with regard to V&M Tubes' contracts with its Texas subsidiaries, such as its service, patent, trademark, license, and

interest-bearing loan agreements, Doc. 45 at 20-25, Exs. 11-12, these contracts are likewise not indicative of greater than normal control. In fact, the need for such formal contractual relationships may be more indicative of separateness than of unity. *See Alpine View*, 205 F.3d at 219 ("The existence of intercorporate loans does not establish the requisite dominance, and in fact, interest-bearing loans suggest separation of corporate entities." (citation omitted)).

In *Alpine View*, faced with a situation where (i) the parent corporation owned all the stock of a direct subsidiary, which in turn owned all the stock of three indirect subsidiaries; (ii) a number of individuals served as officers or directors for parent and subsidiary companies; and (iii) loan agreements were made between the companies, the Fifth Circuit concluded that the level of control necessary to show alter ego did not exist. 205 F.3d at 218-19. An equivalent situation exists here: V&M Tubes and its subsidiaries reflect the usual corporate structure that is, by itself, insufficient to show the existence of an alter ego relationship. Consequently, there can be no general jurisdiction.[3]

B.    *The Zamil Defendants*

SII's main argument for personal jurisdiction over the Zamil Defendants[4] is one of specific jurisdiction. "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*, 131 S. Ct. at 2851 (internal quotation marks omitted). The

---

[3] SII also makes a passing argument for specific jurisdiction over V&M Tubes, but there is no basis for this argument. The alleged tortious interference did not occur in Texas and was not aimed at a Texas resident, and the alleged agreement was not specific to Texas, but covered all of the United States, Canada, and Mexico.

[4] As a preliminary matter, the Court notes that SII filed one response to both Zamil and Saudi Pipes' motions, referring to the two parties collectively as the "Zamil Defendants." SII bases this on its argument that Zamil and Saudi Pipes "operated as a single business enterprise" and should be treated as one for jurisdictional purposes. Doc. 64-1 at 7. Without deciding this question, the Court adopts this treatment for the purpose of the jurisdictional analysis. There are two reasons for this: (i) Khalid Al Zamil and Dr. Fadi Jardali represented both Zamil and Saudi Pipes, and there are some factual disputes regarding on whose behalf particular actions were taken; (ii) the result of the jurisdictional analysis would be the same, regardless. It is worth noting, however, that Saudi Pipes did not exist until May 2008 and faces only one cause of action, for breach of the Second MOU.

key inquiry in this analysis is whether there was "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Pervasive Software*, 688 F.3d at 222 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (internal quotation marks omitted).

SII's argument for specific jurisdiction arises from alleged breaches of oral and written agreements related to the Project. SII contends that the Zamil Defendants' agreements with SII show that they purposefully availed themselves of the privilege of conducting business within Texas. In making this contention, SII offers three main points: (i) SII is a Texas resident; (ii) the Zamil Defendants directed their activities toward Texas through the agreements; and (iii) the agreements necessitated performance in Texas.

SII relies heavily on its status as a Texas resident, repeating this status more than a dozen times throughout its response. As proof of this designation, SII cites its business presence in Texas since 1970 and attaches copies of its franchise tax certificates for 2012 and 2013 (Doc. 64-1 Ex. A-2). But neither of these provides proof of residency, as the privilege of doing business in Texas is not limited to domestic corporations, and the franchise tax applies to domestic and foreign corporations alike. *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 612 (Tex. 2012), *reh'g denied*, (Dec. 14, 2012) (discussing the history and constitutionality of the Texas franchise tax on domestic and foreign corporations since 1893). Moreover, SII's franchise tax certificates state (i) for registered agent, "Not on file," and (ii) for Secretary of State registration date, "Not Registered," Doc. 64-1 Ex. A-2, further indicating that it is not a Texas company. SII argues that the "Zamil Defendants have not shown that SII is not a Texas resident today . . . or at the time of contracting," Doc. 64-1 at 4, but this argument flips the parties' burdens upside down, as it is the plaintiff that is charged with making a prima facie case for personal jurisdiction and presenting

facts establishing such jurisdiction. At least with respect to residency, this cannot be done: SII is not a Texas company, but, in fact, a Delaware corporation conducting business in Texas.

As if in tacit acknowledgment of this reality, SII subtly shifts its stance, stating, "The proper inquiry is the nature and extent of the Defendants' activities and the Defendants' reasonable expectations regarding the potential for litigation in Texas." Doc. 64-1 at 3. This is a more accurate recitation of the law, as even a contract with a Texas resident is, by itself, insufficient to establish minimum contacts between a forum and a nonresident defendant. *Pervasive Software*, 688 F.3d at 222 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Thus, the Court turns its attention to the remaining facts relevant to the jurisdictional analysis.

Instructive in approaching this analysis is the Fifth Circuit's reasoning in *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, where (i) an Alaska corporation agreed to purchase specific goods to be manufactured in Texas by a Texas corporation; (ii) payment was to be made in Texas; (iii) extensive negotiations included two visits to Texas by the Alaska corporation's officers to resolve disputes and inspect equipment and facilities; (iv) the officers traveled to Texas again to "close" the deal; and (v) the contract was finalized in Texas. 700 F.2d 1026, 1028-29 (5th Cir. 1983). Despite these connections to the forum state, the Fifth Circuit held that personal jurisdiction did not exist, basing its reasoning on certain key facts: (i) the business was solicited by the Texas corporation in Alaska; (ii) the contract expressly provided that it was governed by Alaska law; (iii) the contract did not require any performance by the Alaska corporation in Texas, other than paying for the goods; (iv) the only performance required of the plaintiff in Texas was its manufacture of the goods, which would then be delivered to Alaska;

and (v) the Alaska corporation's contacts with Texas were limited to this single transaction. *Id.* at 1029.

The importance of these facts cannot be overstated, as the *Hydrokinetics* holding has been repeatedly upheld and expounded by the Fifth Circuit. *See Freudensprung*, 379 F.3d at 345 (emphasizing the foreign choice-of-law provision and place of performance outside the forum state); *Dudek v. Donald C. & Eleanor J. Glanville Revocable Trust*, 109 F. App'x 657, 658-59 (5th Cir. 2004) (same); *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 94-95 (5th Cir. 1992) (emphasizing that the nonresident buyer was approached in its home state by the Texas seller, the initial negotiations were conducted in the buyer's state, and the agreement provided that the law of the buyer's state was controlling); *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 548-49 (5th Cir. 1985) (the foreign choice-of-law clause, the absence of a requirement for the defendant to perform in the forum state, and the delivery of goods to the defendant's state). In *Moncrief Oil International Inc. v. OAO Gazprom*, the Fifth Circuit once again recalled the significance of the findings of fact in *Hydrokinetics*. 481 F.3d 309 (5th Cir. 2007). The *Moncrief* court cited *Hydrokinetics* to support its decision not to exercise jurisdiction over Russian defendants, where the plaintiff, a Texas corporation specializing in oil and gas projects, entered into an agreement to secure financing, provide technical expertise, and invest $120 million in support of the development of a natural gas field in Russia. *Id.* The court noted in particular that the contract was "silent as to location" of the plaintiff's performance and there was "no indication that the location of the performance mattered." *Id.* at 313. The court also found that a visit to Texas by one of the foreign executives for planning and negotiations was insignificant and did not create personal jurisdiction. *Id.*

Reading these cases together, it is clear that considerable weight should be given to certain factors that are relevant to this dispute: (i) the party and place of the initial business solicitation; (ii) the law governing the contract; (iii) the defendant's required place of performance under the contract; (iv) the plaintiff's required place of performance under the contract; and (v) the extent of the nonresident's contacts with the forum state. SII's second and third points (the first, its purported Texas residency, has already been addressed) relate to the last two factors, but all five must be addressed.

Regarding the first factor, it was SII that first identified an opportunity for development in Saudi Arabia, prepared a feasibility study in pursuit of that opportunity, obtained a license for the Project from the Saudi government, and solicited Zamil's partnership in the Project. Regarding the second factor, the choice-of-law provisions: the First MOU is governed by the laws of Saudi Arabia; the Second MOU, by the laws of England.

As for the required place of performance, both of the agreements are silent as to the specifics, though the First MOU makes the place of the ultimate objective clear: "[t]he objective is to set up a Heat Treating and Threading integrated facility in Saudi Arabia." Doc. 26-2 at 1. SII argues that its performance in Texas was foreseeable because Texas is an OCTG hub, but mere foreseeability that a party might perform many of its duties in Texas is, standing alone, insufficient to create jurisdiction. *Moncrief*, 481 F.3d at 312-13. Foreseeability would, however, support a finding of jurisdiction if it were combined with the fact that "the forum state was 'clearly the hub of the parties' activities,'" *Id.* at 312 (quoting *Miss. Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1008-9 (5th Cir. 1982)), but in this case, that hub is Saudi Arabia. "Moreover, a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require

performance in Texas, and the contract is centered outside of Texas." *Id.* (citing *Hydrokinetics*, 700 F.2d at 1029). Here, Zamil did not perform any obligations under either the First or Second MOU in Texas, the contract did not require performance by any party in Texas, and (again) the contract was centered in Saudi Arabia. Finally, it is not even clear how much work SII actually performed in Texas. SII's Houston office is currently unoccupied, Doc. 64-1 at 3, and the two employees affiliated with that office reside outside of Texas: Charles Tarazi has homes in New York; London, England; and Theoule, France, and visits SII's Houston office only once or twice a year, Tarazi Dep. 6:2-15, June 8, 2012, Doc. 61-3; and Michael Rafferty moved from Texas to New Jersey in 2007, Rafferty Decl. ¶¶ 3, 16, Doc. 64 Ex. B. The record shows that their solicitation of business pursuant to the agreements was done primarily from those remote locations; more importantly, the agreements did not *require* any of that work to actually be performed in Texas.

The final factor is the extent of the nonresident's contacts with the forum state. The allegations relevant to this factor are that representatives of Zamil made three trips to Texas and that Zamil and Saudi Pipes negotiated and contracted with other Texas companies. The three trips included (i) a visit in 1995 by Al Zamil to study the nature of the OCTG business; (ii) a meeting in May 2008 by Dr. Jardali ("Jardali"), Zamil's General Manager of Corporate Business Development, to discuss the Project, and (iii) another meeting in Texas in January 2009 by Jardali, also regarding the Project. Doc. 46 at 3, 6. But "[a]n exchange of communications in the course of developing and carrying out a contract . . . does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law." *Moncrief*, 481 F.3d at 312. "Otherwise, jurisdiction could be exercised based only on the fortuity that one of the parties happens to reside in the forum state." *Id.* Here, of course, neither party resides in the forum state;

moreover, the majority of the parties' communications occurred outside Texas, including SII's initiation of the Project, its solicitation of Zamil as a partner, and their multiple meetings in Europe.

Regarding the Zamil Defendants' negotiations and contracts with other Texas companies, the key consideration is that specific jurisdiction can be established only for causes of action that arise out of or result from the alleged minimum contacts with the forum state. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006) ("We initially consider what appears to be an issue of first impression for our court: Is specific personal jurisdiction a claim-specific inquiry? We conclude that it is. . . . [T]he Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts."). Recalling *Hydrokinetics*, negotiating and contracting with a Texas corporation to manufacture goods and ship them to another location is, by itself, insufficient to establish minimum contacts. The situation here is one step further removed from that scenario, as these contacts with other Texas companies are merely negotiations with third parties to provide goods or services in another location. Furthermore, SII's causes of action are based on nonpayment by Zamil and Saudi Pipes. The payments that *were* made by Zamil were wired from Saudi Arabia to SII's banks in either Switzerland or New York, Jardali Decl. ¶ 11, May 16, 2012, Doc. 35-1, so it is unclear how failure to make such payments implicates Texas's jurisdictional reach. Because specific jurisdiction over claims of nonpayment must arise out of or result from contacts related to that nonpayment, negotiations and contracts with third parties are, as a matter of law, insufficient to establish this jurisdiction.

In sum, multiple factors weigh against exercising specific personal jurisdiction: neither party is a Texas resident; the initial solicitation was the plaintiff's pursuit of a Saudi partner for a

construction project in Saudi Arabia; the agreements were governed by the laws of Saudi Arabia or England; the agreements did not require either party to perform in Texas; and the nonresident defendant's contacts with Texas are not directly related to the plaintiff's causes of action. Given these findings, the Court concludes that due process cannot be satisfied; therefore, the exercise of personal jurisdiction over Zamil or Saudi Pipes would not be proper.

Finally, SII also argues for the exercise of general jurisdiction over the Zamil Defendants, but such jurisdiction requires even more substantial contacts than those already established: this test "is a difficult one to meet, requiring extensive contacts between a defendant and a forum," and "even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609-10 (5th Cir. 2008) (alterations, citations, and internal quotation marks omitted). Considering the Court's conclusion that the Zamil Defendants' contacts with Texas are insufficient to meet the specific jurisdiction standard, the addition of some negotiations or a few purchase orders with third parties is likewise insufficient to meet the standard for general jurisdiction.

## IV.   Conclusion

Because no minimum contacts exist to exercise personal jurisdiction over the Defendants, it is unnecessary to consider whether such jurisdiction "would violate traditional notions of fair play and substantial justice," *Moncrief*, 481 F.3d at 314-15, nor is it necessary to reach V&M Tubes' argument for failure to state a claim or the Zamil Defendants' argument for forum non conveniens. Accordingly, it is hereby

   **ORDERED** that V&M Tubes' motion (Doc. 25) is **GRANTED**; it is further

   **ORDERED** that Zamil's motion (Doc. 26) is **GRANTED**; it is further

**ORDERED** that Saudi Pipes' motion (Doc. 35) is **GRANTED**, and Plaintiff's First Amended Complaint is **DISMISSED**.

SIGNED at Houston, Texas, this 29th day of March, 2013.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE